IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

GOLF COURSE ASSOC, LLC, a
Delaware limited liability company,
and TOLL BROS., INC., a Delaware
corporation,

    Petitioners,

        v.

NEW CASTLE COUNTY, a political
Subdivision of the State of Delaware,
NEW CASTLE COUNTY
DEPARTMENT OF LAND USE, and
NEW CASTLE COUNTY BOARD OF
ADJUSTMENT,

    Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 15A-02-007 JAP

## **Opinion**

This dispute arises out of the proposed development of 263 single-family homes on the site of the former Delaware National golf course. Petitioner Toll Brothers,[1] the developer, has gone through the lengthy permitting process set out in New Castle County's

---

[1] Golf Course Associates holds legal title to the property and Toll Bros. has equitable title to it. The court need not dissect the relationship between two because it plays no role in the outcome of this dispute. For shorthand purposes the court will refer to the petitioners collectively as "Toll Bros." in this opinion. In order to avoid any confusion which might arise from this shorthand, the court notes that the rulings in this opinion apply to both petitioners.

Unified Development Code (the "UDC") only to learn near the end of the process that it would not be allowed to develop the property because of the county's Department of Land Use's concern about traffic congestion near the proposed development. Toll Bros. appealed the Department's decision to the New Castle County Board of Adjustment, which affirmed the Department in a 4 to 2 vote. It now brings this petition for a writ of certiorari challenging the Board of Adjustment's decision.[2] For the reasons which follow, that decision is affirmed.

## I. Background

In the late 1930's Hercules Powder Company constructed a golf course for it employees on a site located near Route 48 (Lancaster Pike) outside of Wilmington. Corporate priorities changed as the years passed, and Hercules eventually divested itself of the golf course. It continued to be operated under the name "Delaware National Country Club" by a private entity under a lease with the new owners of the real estate upon which the course was located. Rising land values, the potential for development and the

---

[2] The court expresses its appreciation to counsel for both sides for the excellent briefs they have submitted.

post-millennium economics of golf course operation, however, led to the closure of the course in 2010. Toll Bros. made plans to build homes on the former golf course, calling the proposed development "Delaware National."[3] It is this development which gives rise to the instant case with the county over the Board of Adjustment's decision.

### A. *The procedures for obtaining land use permits*

The land use permitting process in New Castle County is governed by the county's Unified Development Code.[4] The process is thorough and arduous, consisting of at least four major phases: the first is the Pre-application Sketch Plan; second, the Exploratory Plan; third, the Site Construction Plan; and fourth the Record Plan.[5] Each phase is itself complex, requiring the submission of numerous documents and studies.[6] Like many municipal governments, New

---

[3] Toll Bros. has already developed a comparatively small portion of the former course now known as "Greenville Overlook." For shorthand purposes the court will refer to the undeveloped portion of the golf course simply as the "golf course."

[4] UDC § 40.31.380 ("In rendering a decision, the . . ., Board of Adjustment. . . . or administrative body shall be bound to follow the provisions of this Chapter. The following rules shall govern decisions[:] All decisions shall be based solely upon the provisions of this Chapter").

[5] In some instances the Record Plan must be submitted to County Council for final approval.

[6] For example in the Site Construction Plan phase the developer is required to submit, among other things:

> a. Record check prints, to include proposed topography, dwelling
> units and any other proposed improvements. (15 copies)

Castle County uses a submit-and-review permitting process.[7] This method entails submission of required documents by the developer followed by review by the appropriate county employees. Upon completion of that review, the county issues a review letter to the developer either approving the submission, approving conditioned upon specified changes or disapproving the submission. According to Toll Bros. it received at least nine review letters in connection with the instant development.

The final phase is the submission and approval of the Record Plan. State law requires that such plans must be approved both by

b. Landscape/Open Space Management Plan. (4 copies)

c. One (1) copy of all special studies for which a decision or recommendation is required by the Board of Adjustment, Planning Board, Historic Review Board, or Resource Protection Advisory Committee; or which is subject to any other special studies.

d. For land development applications that contemplate connection to County sewer, a letter from the Department of Special Services indicating that sewer is or will be available for the proposed development.

e. One (1) copy a complete site construction plan submission in accordance with the Engineering Submission Requirements of Chapter 12 of the County Code, including:

1 Stormwater Management Plan
2. Erosion & Sediment Control Plan
3. General Grading Plan/Lines & Grades
4. Pre-Bulk Plan
5. Post Bulk Grading Plan
6. A Sequence of Construction

UDC Appendix 1.

[7] Similarly, state law requires a meet and review process in connection with any pre-application filing. 29 *Del. C.* § 9203

the Department of Land Use and New Castle County Council.[8] (In this case the Record Plan was not approved by the Department of Land Use and therefore it was never submitted to County Council for its review.) After approval the Record Plan is recorded in the Recorder of Deeds office.[9] In the event a plan is recorded which has not been approved by the Department and Council, state law also provides that plan "shall be null and void and without legal effect and shall upon application of the Commission or the County Council, to the Superior Court, be expunged from the records of the Recorder of Deeds."[10]

## B. Concurrency and the Traffic Impact Study.

New Castle County's scheme for regulating development is based on the concept of concurrency. In general terms "concurrency" means that infrastructure necessary to support the proposed development must already exist or will exist by the time the development is completed. The idea is to prevent the need for new infrastructure from outstripping the government's ability to provide it. The first step in the application of concurrency

---

[8]    9 *Del. C. § 3007(a).*
[9]    9 *Del. C. § 3009.*
[10]   9 *Del. C. § 3007(b).*

principles is an assessment of the "carrying capacity" of a proposed development; in other words, a determination how much development will the existing surrounding infrastructure support.[11] The UDC requires this analysis:

> This Article requires an applicant for a . . . subdivision development plan or land development plan to conduct a carrying capacity analysis which regulates the maximum intensity of development based on actual infrastructure capacity. The carrying capacity analysis is designed to ensure that the public health, safety, welfare and quality of life of the citizens of this County are protected by preventing development from exceeding the existing carrying capacity of public facilities needed to sustain the proposed development
>
> This Article establishes the actual development capacity of individual sites based on current adequacy ("concurrency") of roads, water, sewers, and schools. Concurrency for these facilities shall be obtained through compliance with this Article, Article 11, Article 12, and Article 14.

The carrying capacity establishes a limit on the size and density of a proposed development.

Perhaps not surprisingly, traffic congestion is often a major consideration in a carrying capacity analysis,[12] and indeed the

---

[11] UDC § 40.01.015 The UDC is intended to "[e]nsure the provision of adequate public facilities including transportation, public utilities, and public services by providing that development does not exceed the carrying capacity of these facilities or systems, or requiring impact fees to offset the cost of the improvements."

[12] The carrying capacity is calculated for each of the limiting factors—roads, water, sewers and schools—and the carrying capacity of a proposed development is the "site carrying capacity is the lowest site yield as determined by [these separate calculations]." UDC § 40.05.500. In this case traffic is the limiting factor.

Delaware National development was limited by the site's traffic carrying capacity. The UDC expressly recognizes that the "County has numerous areas of congestion that may limit the development potential of a site;"[13] traffic is first in the UDC's list of criteria to use in making a carrying capacity determination.[14] Concurrency under the UDC is tied to existing infrastructure,[15] and therefore the traffic carrying capacity is "based on the current adequacy or roads."[16] When measuring the Level of Service of affected intersections planners may also take into account "projects currently under construction or for which contracts for construction have been awarded by DelDOT to ensure completion."[17]

By definition, the traffic carrying capacity of a development site is finite. The UDC provides that "[e]ach proposed development

---

[13] UDC § 40.05.000.
[14] The UDC recites that

> The County has numerous areas of congestion that may limit the development potential of a site. Each proposed development is allocated capacity based upon a traffic impact study for the proposed development. The allocation of this capacity sets a maximum development potential for each site.

UDC § 40.05.000.
[15] The UDC expressly "establishes the actual development capacity of individual sites based on current adequacy ("concurrency") of roads, water, sewer, schools. and thus, by statute, the traffic carrying capacity of a development must "be based on current adequacy ("concurrency") of roads." UDC § 40.05.000.
[16] *Id.*
[17] UDC § 40.11.120.

is allocated [any available] capacity based upon a traffic impact study for the proposed development. The allocation of this capacity sets a maximum development potential for each site."[18] If there is available capacity to allocate to new development it "is allocated to proposed land developments on a first come-first serve basis."[19]

The traffic capacity of a proposed development site is determined by a Traffic Impact Study,[20] a technical document prepared by professional traffic engineers who are retained by the developer. The TIS is complex and must, by statute, include:

1. The anticipated trip generation of the land use.

2. New traffic counts will be required for all intersections in the area of influence of the proposed development.

3. Currently planned traffic mitigation programs and transportation improvements, including, without limitation, projects awarded or under construction, projects in DelDOT's CIP and their completion dates.

4. The projected peak hour level of service after the proposed development is completed, with and without traffic mitigation measures.

* * *

---

[18] UDC §40.05.000.A.
[19] UDC §40.11.000.
[20] UDC §40.11.110.

8. A statement indicating whether the peak hour level of calculated for each road segment and intersection will exceed the acceptable level of service for the type of service roadway segment and intersection pursuant to Section 40.11.210.[21]

The UDC requires that the completed TIS be provided to the Delaware Department of Transportation for its written review and comment.[22] The UDC specifies the contents of the review, which must include a "statement addressing the ability of the existing and planned transportation system to support the proposed . . . land development."[23] DelDOT has sixty days (which may be extended)

---

[21] UDC § 40.11.130.

[22] There is an agreement between the county and DelDOT whereby DelDOT will review TIS's submitted to it.

[23] UDC § 40.11.140. It provides:

A. The review of the traffic impact study shall include the following:
1. A statement indicating whether a traffic impact study was previously submitted and evaluated for the same or a substantially similar rezoning, subdivision, or land development application, and if so, the results of that evaluation including any recommended mitigation measures. The statement may also contain an evaluation and findings of any other concurrent TIS for applications in the immediate area;
2. A statement assessing the ability of the existing and planned transportation system to support the proposed rezoning, subdivision, or land development;
3. A statement describing the extent to which the proposed rezoning, subdivision, or land development is consistent with the adopted *WILMAPCO Metropolitan Transportation Plan*;
4. A statement describing the extent to which the proposed rezoning, subdivision, or land development complies with applicable DelDOT standards or regulations for access and subdivision design, and with the standards in Section 40.11.210;
5. A statement certifying the adequacy of the recommended traffic mitigation measures to bring the network back to the desired level of service in Section 40.11.210 .

in which to provide its review and comments to the county.[24] The TIS and DelDOT's comments are then reviewed by the county's Department of Land Use to determine if criteria set out in the UDC have been satisfied.[25] The UDC requires that after this review the Department approve the TIS, approve it with conditions or disapprove it.[26]

The primary metric used to measure traffic congestion is the Level of Service (LOS) of intersections within the area of influence of the proposed development. (The "area of influence" is a term of art and is determined by criteria contained in the UDC.)  It is

---

[24] UDC § 40.11.110.  In the unlikely event DelDOT cannot timely submit its review and comments to the county the UDC allows the developer, with the consent of the county, to hire a traffic engineering firm to prepare comments on the TIS. *Id.*

[25] UDC §40.11.150.  The section requires that the

> Department shall review the traffic impact study with  regard to the following:
>
> 1. The accuracy, completeness, and thoroughness of the traffic impact study as well as whether the study was conducted in conformance to the study parameters set by the Department and DelDOT.
>
> 2. DelDOT's comments and recommendations when DelDOT reviewed the traffic impact study.
>
> 3. The level of service requirements of this Article.
>
> 4. Appropriateness and adequacy of any proposed mitigation measures.
>
> 5. Compatibility with regional and State transportation plans and nearby development proposals.
>
> 6. Design principles and standards as described in this Chapter (e.g., inter-connectivity, transit/pedestrian accessibility and street design).

[26] UDC §40.11.150.B.

calculated by traffic engineers using standard formulas, which take into account such things as the number of vehicles and the amount of time spent waiting at the intersection at peak travel times of the day. The result of these calculations is a letter grade, which spans from "A" to "F," and the UDC provides that "[n]o major land development . . . shall be permitted if the proposed development exceeds the level of service standards set forth in this Article unless the traffic mitigation or the waiver provisions of this Article can be satisfied."[27]   The minimum level of service standard for an intersection such as the one at Lancaster Pike and Centerville Road is a "D".[28]

## C.  *The TIS in this case*

The TIS in this matter was prepared by Traffic Planning and Design, Inc. ("TPD"). DelDOT often retains an engineering firm to review TISs submitted to it, and in this matter it retained McCormick Taylor to do so.  TPD rated the 2010 level of service  of the Lancaster Pike/Centerville Road as an "F" and the anticipated

---

[27]    UDC § 40.11.000.
[28]  The UDC differentiates between intersections with sewer lines (such as Lancaster Pike and Centerville Road) from those which do not have them.  The statutory minimum acceptable grade for the former is "D"; the minimum for the latter is "C".

2016 LOS as "F." McCormick Taylor was a little more generous in its assessment of the intersection of the 2010 LOS, rating it a "D", but it too generally projected an "F" rating for 2016.[29] The "F" rating projected for 2016 meant that the anticipated congestion at that intersection would exceed the standards allowed by the UDC. According to McCormick Taylor:

> The proposed development will not meet the New Castle County Level of Service (LOS) Standards as stated in . . . the Unified Development Code unless physical roadway and/or traffic control improvements are implemented.

This in turn meant that the UDC would require the Department to disapprove the TIS.

### D. Toll Bros. seeks to ameliorate the congestion

Even before the issuance of the McCormick Taylor comments Toll Bros. anticipated the intersection would be a stumbling block to its plans, so it designed modifications to the intersection which it believed would remedy the congestion. The anticipated cost of those modifications was $1.1 million, which Toll Bros. offered to contribute. DelDOT was not enamored with Toll Bros.' proposed fix

---

[29] McCormick Taylor predicted a "D" LOS in 2016 if a third through lane were to be added to westbound and eastbound approaches to the intersection on Lancaster Pike. DelDOT currently has no plans to construct such a lane.

which, according to McCormick Taylor, "must not only work from a technical perspective regarding the placement of appropriately designed infrastructure improvements, but also from a traffic management and safety perspective." It preferred instead a possible solution costing $3.5 million, but was willing to accept Toll Bros.' proffered $1.1 million contribution and apply it toward the cost of a future construction of its preferred solution. DelDOT, however, made no commitment as to when, if ever, it would modify the intersection. McCormick Taylor summarized the situation:

> DelDOT will accept and require the developer to contribute towards a future project of the type described in the Conceptual Plan, although the specifics of any future project for improvements at this intersection are still to be determined, and while reserving the right to apply such funds to a different solution at this intersection, at such time and under such conditions as the Department may determine.

### E. *DelDOT's Letter of No Objection*

The same day it received the McCormick Taylor report, DelDOT wrote the county advising it had no objection to recording of the site plan for the Delaware National development:

> This "No Objection to Recordation" letter
> is <u>not</u> a DelDOT endorsement of the project

discussed above. Rather, it is a recitation of the transportation improvements, which the applicant may be required to make as a pre-condition to recordation steps and deed restrictions as required by the respective county/municipality in which the project is located. * * * Ultimate responsibility for the approval of any project rests with the local government in which the land use decisions are authorized. There may be other reasons (environmental, historic, neighborhood composition, etc.) which compel that jurisdiction to modify or reject this proposed plan even though DelDOT has established that these enumerated transportation improvements are acceptable.[30]

### F. The Department of Land Use Disapproves the TIS and Toll Bros.' Subdivision Plan Expires

The Unified Development Code requires that a developer submit a Record Plan within three years of receiving the county's response to the developer's exploratory plan (which is the document that sets the process in motion). The submission of the Record Plan is dependent upon obtaining the county's approval of the TIS because, according to section 31.113.C.2 of the UDC, "[n]o Record Plan submission shall occur until such time as the TIS is approved." Another section of the UDC also conditions the submission of a Record Plan on the approval of the TIS; section

---

[30] Underscoring in original.

40.11.150.C provides "[o]nce the traffic impact study is approved or approved with conditions for a major plan, the applicant may proceed with a record plan submission as provided in Article 31."

A month after receiving the DelDOT No Objection Letter, the county Department of Land Use notified Toll Bros.' engineer that the Toll Bros.' Record Plan could not be filed because the Department of Land Use had disapproved the TIS. The notification letter recited that the UDC barred any Record Plan Submission by the developer until the Department of Land Use had approved (or approved with conditions) the TIS. The letter also stated that the Department was prohibited from approving any TIS when the LOS of any intersection within the area of influence would be rated less than "D." Since the projected LOS for the Lancaster Pike/Centerville Road intersection was an "F the Department was required to disapprove the TIS.

The disapproval of the TIS had significant repercussions for Toll Bros. By statute it precluded Toll Bros. from submitting its Record Plan, and this in turn resulted in the expiration of the three year window which Toll Bros. had under the UDC to obtain the necessary approvals for Delaware National. The UDC requires the

15

developer to submit this plan within three years of the date of the county's review of the developer's Exploratory Plan. (The Department of Land Use is authorized to allow two 90 day extensions of this deadline and did so here.) If the developer fails to submit a timely Record Plan (whether by neglect or because of its failure to obtain the required approvals) any previous approvals from the county in connection with that project are deemed to have expired and the developer must start the process anew if it wishes to pursue the project. By the time the McCormick Taylor comments were sent to the Department of Land Use and the Department disapproved the TIS Toll Bros. the three year period (plus its extensions) had run. Thus the Department deemed that Toll Bros.' plan to have expired.

## G. Toll Bros. Appeals to the Board of Adjustment

Toll Bros., as was its right, appealed the disapproval of the TIS, the rejection of the Record Plan and the resultant expiration of its subdivision plan to the New Castle County Board of Adjustment. The appeal consisted of submission of written arguments, oral

16

argument and the opportunity for an evidentiary hearing (which Toll Bros. did not request). According to the Board,

> This appeal turns on the question of whether the Department [of Land Use] properly interpreted and applied relevant provisions of [the UDC] to [Toll Bros.'] Plan submissions when it decided that the plan had expired without the submission of an acceptable TIS. Put another way, it is the contention of [Toll Bros.] that the Department improperly invoked the requirements of the Code in its determination that the submitted TIS was unacceptable and therefore, the Plan had expired.

Although not mentioned in the above summary by the Board, Toll Bros. also presented an argument that the Department's decision was an unconstitutional exaction. The Board addressed that argument in its opinion and the court finds Toll Bros.' constitutional argument has been preserved.

Following the hearing the Board issued a written opinion in which it set forth its analysis in detail. The Board reasoned that the substandard level of service at the Lancaster Pike/Centerville Road intersection required disapproval of the TIS. Toll Bros., according to the Board, could not submit the Record Plan unless the TIS was approved. Because Toll Bros. submitted the Record Plan within the required three years, the Board concluded its

application had expired. It voted 4 to 2 to affirm the Department of Land Use,[31] and this writ of certiorari followed. This court will affirm the Board for much of the same reasoning it used.

## II.  Toll Bros.' Contentions

The crux of this dispute is whether the Department of Land Use acted unlawfully when it disapproved the TIS.  According to Toll Bros., if the Department had acted lawfully and approved the TIS, its Record Plan submission would have been timely and it would not be required to start over again.  It raises both state law and federal constitutional challenges to the Department's and decision and the board's affirmance:

1. The Department of Land Use's conclusion that the Department lacked authority to disapprove the TIS is contrary to the law.

2. The Department's disapproval of the TIS is not supported by substantial evidence.

3. The Department's and Board's decision amounted to an unconstitutional exaction.

---

[31] The Board consists of seven members.  One was absent from the hearing and did not participate in the vote.

## III. The standard of review

This matter comes to this court by way of a writ of certiorari. At common law, the court's review in a writ of certiorari appeal was limited to a determination whether the inferior tribunal "exceeded its jurisdiction, committed errors of law, or proceeded irregularly."[32] Factual findings by the lower tribunal were not subject to review.[33] For reasons which may now be lost to history, Delaware enacted a certiorari statute peculiar to Board of Adjustment hearings which vests this court with a broader scope of review in land use matters. Section 1314 of title 9 provides in pertinent part:

> (a) Any person aggrieved by any decision of the Board of Adjustment, or any taxpayer or any officer, Department, board or bureau of the County, may present to the Superior Court a petition duly verified alleging that such decision is illegal in whole or in part, and specifying the grounds of illegality.

> (d) [T]he Board of Adjustment] shall concisely set forth such other facts as may be pertinent and material to show the grounds of the decision reviewed and shall be verified.

> (e) If, upon the hearing, it shall appear to the Court that testimony is necessary for the proper disposition of the matter, it may take evidence . . . which shall

---

[32] *Christiana Town Center, LLC v. New Castle County,* 865 A.2d 521 (Table), 2004 WL 2921830, at *1 (Del.).
[33] *Id.*

19

> constitute a part of the proceedings upon which the determination of the Court shall be made.

One notable feature of the statute relates to the scope of evidentiary review. As noted, common law review on certiorari was confined to a determination of the legality of the lower tribunal's ruling and did not permit the reviewing tribunal to review the sufficiency of the evidence. This statute, however, contemplates some sort of review of the evidence by this court; its provision that the board "shall concisely set forth such other facts as may be pertinent . . . to show the grounds of the decision reviewed" can have no other meaning. Delaware courts applying this statute have sanctioned judicial review of the evidence, at least to the extent that the court must determine whether it is sufficient to support the board's findings.[34] This review is not plenary, and this court is not free to re-weigh the evidence before the Board of Adjustment.[35] And,

---

[34] *See Mellow v. Board of Adjustment of New Castle County*, 565 A.2d 947, 950 (Del Super. 1988); *Janaman v. New Castle County Bd. of Adjustment*, 364 A.2d 1241, 1242 (Del. Super. 1976); *see also Cooch's Bridge Civic Ass'n v. Pencader Corp.*, 254 A.2d 608, 609 (Del. 1969).

[35] The court notes in passing that it is difficult to reconcile the prohibition against weighing the evidence on certiorari under section 1314 with the statute's authorization for this court to "take evidence . . . which shall constitute a part of the proceedings upon which the determination of the Court shall be made." The ability to take evidence seems pointless if the court is not free to then weigh it against evidence already in the record. Fortunately it is not necessary reach this issue here. As Toll Bros. correctly writes in its brief, "the factual record [is] largely uncontroverted."

20

because of the Board's technical expertise, this court is not free to alter the board's decision simply because it might have reached a different result if it were considering the matter *de novo*.[36]

## IV. Analysis

As set forth at length below, Toll Bros. contends that Department of Land Use was not free to disapprove the TIS, but the court finds that the UDC expressly required the Department to independently review the TIS. The court further finds that the Department was obligated to disapprove the TIS (as it did) because the intersection at Lancaster Pike/Centerville Road did not meet the minimum standards specified in the UDC. Toll Bros. also argues that the county's disapproval of the TIS and its rejection of the Record Plan amounts to an unconstitutional exaction. The court disagrees. An essential element of the unconstitutional exaction doctrine is a coercive demand by the government. Here the county never made any demand, much less a coercive one.

---

[36] *Holowka v. New Castle County Bd. of Adjustment*, 2003 WL 21001026, at *3 (Del Super.); *Mellow*, 565 A.2d at 954; *see Cooch's Bridge Civic Ass'n*, 254 A.2d at 610 (Del. 1969).

### A. *The county's application of the UDC is consistent with the law and is supported by substantial evidence.*

Toll Bros. argues that the Department's disapproval of the TIS is inconsistent with the UDC and is not supported by substantial evidence. It theorizes that under the UDC DelDOT, not the county, is the final arbiter on traffic issues. Toll Bros. also contends that written communications from employees of the county's land use Department show that DelDOT is the final arbiter of traffic issues in land development matters. The court finds that state law, the applicable provisions of the UDC as well as judicial precedent vest the county with final authority to decide whether traffic issues warrant denial of a land use permit. The court further finds that the county employees did not—and could not—alter the unambiguous language of the relevant provision of the UDC.

### 1. The county had the authority to review the TIS

It is manifest that the General Assembly intended New Castle County, not state government, to have the final say in land use matters. The General Assembly granted authority to the county to regulate land use matters within it, except for property located

within the corporate limits of another political subdivision. The Delaware Code provides that "[i]n order to provide for the orderly growth and development of the County, to promote the health, safety, prosperity, and the general welfare of the present and future inhabitants of the County . . . the Commission [defined to be the Department of Land Use in 9 *Del. C.* section 3001(1)] may regulate the subdivision of all land in the County not within the corporate limits of any city or town." Although state government retains a role in some aspects of land use planning, the General Assembly has provided that "[n]othing in [the land use planning chapter of the Delaware Code] shall be construed to deny local jurisdictions their final decision-making authority over proposed land use planning actions."[37]

New Castle County ordinances leave no doubt that the county is the final decision maker in matters relating to land use. For example, in an ordinance entering into a co-operation agreement with DelDOT on traffic matters the county made it clear it was not relinquishing its final say. According to 28.01.004 of the New Castle County Code:

---

[37]  29 *Del. C. § 9206(a).*

> The County Council does hereby adopt the following regarding the joint highway division/County policy on phasing land development with highway capacity:
>
>> County Council will continue to make the final decisions on rezoning and record plans.

With respect to the specific issue of approval of the TIS, the UDC unambiguously provides that it is the county, not DelDOT, which has the final say whether to approve the TIS. Section 40.11.150 requires that the Department of Land Use itself review the TIS:

> Upon receipt of the traffic impact study and comments from DelDOT . . . the Department shall review the traffic impact study with regard to the following:
>
>> 3. The level of service requirements of this Article.

The same section requires that, after this review, "the Department shall approve, approve with conditions or disapprove the traffic impact study." Finally the section makes this approval a pre-condition to the developer's submission of the record plan.[38] The statute leaves no room for doubt, therefore, that the county's Department of Land Use has the final say whether to approve the TIS and its approval is required before the developer may file the

---

[38] Section 40.11.150 provides "[o]nce the traffic impact study is approved or approved with conditions for a major plan, the applicant may proceed with a record plan submission."

Record Plan. In other words, DelDOT's comments on the TIS and its Letter of No Objection are advisory and do not bind the county.[39]

Case law also supports the county's ultimate decision-making authority. In a case involving both Toll Bros. and DelDOT—*Toll Bros. v. Wicks*[40]—former Chancellor Chandler reviewed the statutory framework discussed above and, like this court, concluded that DelDOT's role was merely advisory:

> [I]t is clear as matter of law that, under the UDC, DelDOT's role in the TIS approval process is advisory. Section 40.11.150 of the UDC makes clear that DelDOT merely offers recommendations and comments to the ultimate decision-maker, i.e., New Castle County. * * * Thus, the UDC provides that DelDOT's TIS recommendations are merely advisory. They are not binding and DelDOT's recommendations do not constitute a final decision. This is in accord with Delaware law, legal precedent of this Court and the New Castle County Municipal Code.

---

[39] DelDOT seems to subscribe in this case to the theory that it, not the county, is the final arbiter on traffic concerns spring from Delaware National. In its Letter of No Objection DelDOT wrote:

> Ultimate responsibility for the approval of any project rests with local government in which the land use decisions are authorized. *There may be other reasons* (environmental, historic, neighborhood composition, etc.) which compel that jurisdiction to modify or reject this proposed plan *even though DelDOT has established that these enumerated transportation improvements are acceptable.* [emphasis added]

This view, if it is indeed DelDOT's view, cannot be reconciled with the plain language of section 40.11.150 of the UDC. Nor can it be reconciled with the Court of Chancery's opinion in *Toll Bros. v. Wicks* which is discussed in the text.

[40] 2006 WL 1829875 (Del. Ch.)

Toll Bros. relies upon section 40.31.113 of the UDC which provides:

> For all major plans and plans with rezonings where the Department has not waived traffic analysis requirements, the applicant shall submit traffic information pursuant to Article 11. * * * No record plan submission shall occur until such time that the TIS is approved and the plan meets the concurrency requirements of Article 11.

According to Toll Bros. the language "[n]o record plan submission shall occur until such time that the TIS is approved" is ambiguous because it does not specify by whom the TIS must be "approved". This section must be read in the context of section 40.11.150's requirement that the Department of Land Use "approve, approve with conditions or disapprove the traffic impact study." It is a "well settled rule of statutory construction" that "related statutes must be read together rather than in isolation, particularly when [as in the instant case] there is an express reference in one statute to another statute."[41] When read in conjunction with section 40.11.150, there is no room for doubt that the required approval referred to in section 40.31.113 is that of the Department of Land Use.[42]

---

[41] *Richardson v. Board of Cosmetology*, 69 A.3d 35, 357 (Del. 2013)
[42] The UDC requires the developer to submit the DelDOT Letter of No Objection as a supporting document to the Record Plan submission. UDC §40.31.114 (" Supporting

In sum, the court has no difficulty concluding that under both state and county law, DelDOT's Letter of No Objection was advisory and that the county retained the authority to reject the TIS because of its concerns about traffic congestion.

### 2. Letters from county employees in review letters cannot deprive the county of its authority to approve the TIS

Toll Bros. argues that statements by Department of Land Use employees preclude the county from exercising its authority to reject the plan on the basis of traffic concerns. According to Toll Bros., those statements led it to believe that it was only necessary for it to obtain a Letter of No Objection from DelDOT.[43] The argument fails because statements by public administrators cannot change unambiguous provisions of a statute.

---

documents shall include, but are not limited to: Letter of approval from DelDOT regarding transportation matters.") This does not negate the Department's statutory obligation to review the TIS and either approve it, approve it with conditions or disapprove it. Nor does it negate the statutory provision that the UDC's requirement that the TIS be approved before the developer submits the Record Plan.

[43] Nothing in the letters upon which Toll Bros. relies indicates that the county intended to forego its statutory right to the final say on whether traffic conditions permitted development of Delaware National. At most--as Toll Bros. seems to recognize in its brief--the letters state that one of the requirements of the permitting process was obtaining DelDOT's approval of the TIS. Finally the court notes that although Toll Bros. contends it was "misled" the record is devoid of any evidence as to what Toll Bros. would have done differently if the letters had also reminded Toll Bros. of the clear statutory requirement that it obtain the county's approval of any traffic issues.

The court pauses here to note this is not the first time Toll Bros. has argued it was misled by administrative notices from New Castle County in a land use matter. In *Warren v. New Castle County*[44] the United States District court rejected the contention that Toll Bros., a sophisticated developer represented by counsel, was somehow hoodwinked by an administrative notice:

> Toll further complains that the County's letters did not apprise Toll of its right to appeal to the Planning Board. But Toll cites no authority for a requirement of such notice. Moreover, there can be no doubt that Toll—a sophisticated developer that was represented throughout the land use process by counsel—is aware of the availability of intra-County appellate options.

This court finds the same is true here.

Turning to the merits, the court holds that it cannot consider the statements by county employees when interpreting the unambiguous statute. Our Supreme Court has observed that "[i]t is well settled that statutory language is to be given its plain meaning and that when a statute is clear and unambiguous there is no need for statutory interpretation."[45] The Department of Land Use's statutory obligation to "review the traffic impact study" and

---

[44]  2008 WL 2566947 (D. Del.).
[45]  *State v. Skinner,* 632 A.2d 82, 85 (Del.  1993);  *Board of Adjustment of Sussex County v. Verleysen* 36 A.3d 326 (Del. 2012)(same).

"approve, approve with conditions or disapprove the traffic impact study" is free of any ambiguity.  Thus the court may not resort to statements by county employees to interpret and apply the statute.

The operation of this rule is illustrated in the Delaware Supreme Court's opinion in *Trans-Americas Airlines, Inc. v. Kenton*[46] wherein the plaintiff corporation sought to bar the Secretary of State from registering a corporation with a similar, but distinguishable, name.  The Supreme Court found that the controlling statute was unambiguous and permitted the registration of a similar name so long as the name could be distinguished on the books and records of the Secretary of State.  Of importance here is that the *Trans-Americas Airlines* plaintiff relied in part on statements from an employee of the Division of Corporations that the new corporation's name should not be permitted because of its similarity to plaintiff's name. The Supreme Court quickly dispensed with this contention, writing "we find unpersuasive any view expressed by the Administrator of the Division of Corporations which may be in conflict with both the plain language of the Statute and the action taken by the Secretary of State."  By the same token,

---

[46]   491 A.2d 1139 (Del. 1985).

the statements by employees of the Department of Land Use cannot, as a matter of law, change the unambiguous terms of the UDC.

### B. There is substantial evidence supporting the Department's decision.

Toll Bros. argues there was no substantial evidence to support the Board's decision. The evidence before the Department, however, not only supports the Department's disapproval of the TIS, it shows that the Department was required by law to disapprove it.

The UDC prohibited the Department from approving the TIS in this matter because of the Level of Service at the Lancaster Pike/Centerville Road intersection. The Department is forbidden by statute from approving a plan with a substandard intersection. The UDC requires:

> The Department shall approve the project when the traffic impact study demonstrates that acceptable levels of service will be maintained for roadway segments and intersections within the area of influence of the project as defined by Section 40.11.210 . The *project shall not be approved if it will result in an unacceptable level of service for a roadway segments or intersection(s)* within the area of influence of the project.[47]

---

[47] UDC §40.11.150 (emphasis added)

Elsewhere it provides that "[n]o major land development or any rezoning shall be permitted if the proposed development exceeds the level of service standards set forth in this Article."[48] The UDC further provides that the minimum Level of Service for intersections such as that at Lancaster Pike and Centerville Road is a "D'.[49] Under the TIS prepared by Traffic Planning and Design or the McCormick Taylor review the intersection here would by 2016 be rated "F".[50] McCormick Taylor opined that the

> proposed development will not meet the New Castle County Level of Service (LOS) Standards as stated in section 40.11.210 of the Unified Development Code (UDC) unless physical roadway and/or traffic control improvements are implemented at the following intersections: * * * Delaware Route 48 and Centerville Road.

---

[48] UDC 40.11 .000. The UDC provides an exception when the "traffic mitigation or the waiver provisions of this Article can be satisfied." Toll Bros. does not contend this exception applies.

[49] The Lancaster Pike/Centerville Road intersection is in a sewer service area. With respect to intersections in such areas, the UDC requires:

> The minimum acceptable peak hour level of service to be achieved and maintained on all roadway segments and intersections within the area of influence of the proposal shall be as follows.
>    1. Sewer service areas. Level of service D within any identified sewer service area or publicly sewered area, except that for roadway segments and intersections located within a sewered area or an existing developed area

[50] The TIS, which was done in 2012, rated the intersection as of 2010 an "F" and projected an "F" for 2016 under any of four scenarios. The McCormick Taylor review rated the intersection a "D" as of 2010 and similar to the TIS projected an "F" (with the exception of weekday morning traffic) under any of the future scenarios evaluated in the TIS. McCormick Taylor projected a "D" under a scenario not evaluated in the TIS.

The Department therefore had no choice but to disapprove the proposed development of Delaware National.

Toll Bros. relies upon section 40.11.150.B of the UDC which provides in pertinent part:

> Based upon the above criteria, the Department shall approve, approve with conditions or disapprove the traffic impact study. The Department shall approve the project when the traffic impact study demonstrates that acceptable levels of service will be maintained for roadway segments and intersections within the area of influence of the project as defined by Section 40.11.210 . T*he project shall not be approved if it will result in an unacceptable level of service for a roadway segments or intersection(s) within the area of influence of the project.*[51]

Toll Bros. seizes on the language the "project shall not be approved if it will result in an unacceptable level of service . . . ." Toll Bros. argues that there is already an unacceptable Level of Service and consequently the unacceptable level of service is not the result of Delaware National. It reasons that the statute, therefore, does not authorize the board to deny its application.

If read narrowly and out of context, this passage might provide some comfort to Toll Bros. But Toll Bros. loses any such benefit when that sentence of the statute is placed in the context of

---

[51]   UDC §40.11.150 (Emphasis added).

the immediately preceding sentence, which provides the Department shall approve the project when the traffic impact study demonstrates that "acceptable levels of service will be maintained." Under this portion Toll Bros is not entitled to approval because acceptable levels of service already do not exist and therefore intersection cannot possibly "be maintained" by adding more traffic from its development.

There is an interstitial gap in this portion Section 40.11.150. It provides (1) what must occur if the proposed development does not cause an unacceptable level of service and (2) what must occur if it causes an unacceptable level of service, but it is silent as to what must occur if the proposed development adds to *existing* congestion. This ambiguity calls upon the court to search for the intent of county council when it enacted the UDC.

The hunt is an easy one because County Council has made its intent abundantly clear because Council has expressly stated that the intent of the UDC is the avoidance of traffic congestion:[52]

> This chapter is intended to:

---

[52] There is no dispute that the "alleviation of intolerable local traffic conditions" is a proper public purpose. *Woodwerx, Inc. v. Delaware Dept. of Transp.*, 2007 WL 927943 (Del.).

2. Ensure safe and convenient traffic control and movement including a reduction or prevention of congestion of public streets . . . ;

3. Reduce the danger and congestion of traffic on roads and highways by limiting both the number of friction points, such as intersections and driveways, and minimizing other hazards;

And the introduction to the Article 11 of the UDC recites:

The purpose of this Article is to ensure that development occurs only where there are adequate transportation facilities in place, or programmed for construction.

The notion that the county did not intend to prevent an increase in existing congestion is wholly inimical to the purpose of "reduc[ing] the danger and congestion of traffic." The court therefore has no trouble finding that County Council intended not only to bar development which would *cause* new congestion but also intended to bar development which would *increase* existing congestion.

In its notice to Toll Bros. that it was disapproving the TIS the county relied in part upon McCormick Taylor's statement "an appropriate fix has not been identified for the intersection of [Lancaster Pike] and Centerville Road to achieve the LOS concurrency requirement for New Castle County." Pointing to its offer to pay $1.1 million to modify the intersection, Toll Bros. argues

there is insufficient evidence to support the county's conclusion that "an appropriate fix has not been identified." The argument fails because there is no evidence as to when, if ever, DelDOT will eventually modify the intersection. Further the county has no control over when, if ever, DelDOT will fix the intersection. As discussed earlier, the county is neither obligated, nor legally permitted, to approve the TIS on the assumption that DelDOT may someday improve the intersection. As discussed earlier, New Castle County's regulation of development is based on the concept of concurrency. By statute the county may not approve a new development unless its carrying capacity is supported by existing infrastructure, infrastructure under construction or infrastructure under contract. Therefore the fact that Toll Bros. designed a fix for the intersection and is willing to pay for it does not justify, or even permit, the approval of the TIS.

No evidence has been presented that construction to modify the intersection is underway or that DelDOT (which is solely responsible for changes to the intersection) has awarded contracts for that construction. Any fix therefore lays sometime in the unspecified future. As McCormick Taylor wrote:

35

> DelDOT will accept and require the developer to contribute towards a future project of the type described in the Conceptual Plan, although the specifics of any future project for improvements at this intersection are still to be determined, and while reserving the right to apply such funds to a different solution at this intersection, at such time and under such conditions as the Department may determine.

In short, as a matter of law, the possibility that DelDOT may someday modify the intersection does not permit the Department of Land Use to approve the TIS.[53] There was more than sufficient evidence to support the Department's decision. Indeed, the Department had no choice.

## C. The denial of the permit is not an unconstitutional exaction

Toll Bros. argues that the denial of its application for a permit is an unconstitutional exaction. In a nutshell the unconstitutional exaction doctrine (which is an offshoot of the long-established "unconstitutional conditions" doctrine) prohibits a government from exacting a price from a landowner (whether it be land, an easement, money or something else) in exchange for the grant of a land use permit unless the so-called price (a) has a nexus

---

[53] This holding should not be read too broadly. Recall that Toll Bros. does not contend that any of the mitigation or waiver procedures apply here. The court expresses no opinion whether in an appropriate case those provisions might allow the Department to approve the TIS.

to a legitimate government purpose and (b) bears a rough relationship to the cost of the impact of the proposed land use. Toll Bros. asserts that the county cannot satisfy the rough relationship test. It points out that Delaware National would make only a "negligible" contribution to the congestion and the $3.5 million cost of the fix DelDOT wants is disproportionate to Delaware National's contribution to congestion. According to McCormick Taylor:

> Any such improvements [which DelDOT preferred] to this intersection also carry with them an estimated cost far out of proportion to the measureable impact that this development proposal has on this intersection.

Toll Bros. relies upon a trilogy of United States Supreme Court cases: *Nollan v. California Coastal Commission,*[54] *Dolan v. City of Tigard,*[55] and *Koontz v. St. Johns River Management District.*[56] Before considering those cases it is necessary to briefly touch upon the traditional unconstitutional conditions doctrine and the takings clause of the Fifth Amendment. Generally speaking the unconstitutional conditions doctrine prohibits the government from conditioning a person's receipt of benefits on the person's

---

[54]  483 U.S. 825 (1987).
[55]  512 U.S. 374 (1994).
[56]  ___U.S.____, 133 S.Ct. 2586 (2013).

agreement to forego the exercise of a constitutional right.[57] For example a policy that payments to welfare recipients would be withheld if the recipient posted campaign signs in their windows would likely run afoul of the unconstitutional conditions doctrine.

The unconstitutional exactions doctrine is an application of the unconstitutional conditions doctrine to property owners seeking a land use permit. In such cases the underlying constitutional right the owner is being asked to forego as a condition to obtaining the permit is the owner's right under the Fifth Amendment to just compensation for the taking of property. The Fifth Amendment[58] provides that "nor shall private property be taken for public use, without just compensation."[59] In the paradigmatic case, a "taking" occurs when the government takes property for its own use, such as constructing a road. Another form of taking is a so-called regulatory taking, *i.e.* regulations which unduly restrict the use of

---

[57]  E.g., *United States v. American Library Assn., Inc.,* 539 U.S. 194, 210 (2003) ('the government may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom of speech even if he has no entitlement to that benefit*."); Agency for International Development v. Alliance for Open Society International, Inc.*, 133 S.Ct. 2321 (2013) (invalidating requirement that recipient of government funds must have a policy opposing prostitution).

[58]  The takings clause of the Fifth Amendment was made applicable to the states more than a century ago. *Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 239 (1897).

[59]  The amendment "does not prohibit the taking of private property, but instead places a condition on that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 214 (1987)

property.[60] In the instant matter there has been no physical seizure or occupation of property by the government, and Toll Bros. does not allege a regulatory taking.

## 2. *The* Nollan-Dolan-Koontz *trilogy*

The evolution of the "unconstitutional exactions doctrine" began in 1987 with the Supreme Court's decision in *Nollan v. California Coastal Commission,* was clarified in *Dolan v. City of Tigard* and reached full blossom in *Koontz v. St. Johns River Management District.* These three cases lie at the heart of Toll Bros.' argument.

The Supreme Court first applied the unconstitutional conditions doctrine to a land use matter in *Nollan v. California Coastal Commission.* In that case the owners of beach front property sought a permit to tear down an existing house on their property in order to build a new one. In order to do so the owners needed to obtain a permit from the California Coastal Commission, which agreed to issue one provided the owners granted a public easement across their property. The Supreme Court found this to

---

[60] E.g., *Penn Central Transportation Co. v. New York City*, 434 U.S. 104 (1978).

be an unconstitutional condition, reasoning that "had California simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, we have no doubt there would have been a taking." Restrictions on land use in the legitimate exercise of the government's police power do not constitute a taking if they "substantially advance legitimate state interests" and do not deprive the owner "economically viable use of his land." The dilemma before the *Nollan* court was that "[o]ur cases have not elaborated on the standards for determining what constitutes a 'legitimate state interest' or what type of connection between the regulation and the state interest satisfies the requirement that the former 'substantially advance' the latter."

The Court held that for the exercise of the police power to be legitimate when taking an easement, there must be some "nexus" between the demanded easement and the public interest. The Commission sought to justify its demand for the easement by asserting the easement would reduce obstacles to viewing the beach, reduce congestion on the beach, and lower a "psychological

barrier" to using the beach. The Court rejected these justifications on the basis of the record before it and found the absence of the required nexus. Because there was no nexus, the Court viewed the demand as an extortionate land grab by the commission:

> [T]he lack of nexus between the condition and the original purpose of the building restriction converts that purpose to something other than what it was. The purpose then becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation. Whatever may be the outer limits of "legitimate state interests" in the takings and land-use context, this is not one of them. In short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but "an out-and-out plan of extortion.[61]

Seven years after *Nollan* the Supreme Court was called upon to clarify the second part of the equation: assuming there is a nexus between the exaction and a legitimate public interest, what "degree of connection between the exactions imposed by the city and the projected impacts of the proposed development [is required]."[62] The *Nollan* Court balanced the constitutional requirement of just compensation for a taking against the power of

---

[61] *Nollan v. California Coastal Commission,* 483 U.S. 825, 837 (1987).
[62] *Dolan v. City of Tigard,* 512 U.S. 374, 377 (1994).

governments to engage in land use planning and settled on the formulation that the required conveyance bear a "rough proportionality" to the projected impact of the proposed development. It held that "[n]o precise mathematical calculation is required, but the city must make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development."[63]

Both *Nollan* and *Dolan* involved a demand for the transfer of an interest in real property to which the property owner capitulated. Left unanswered is what result occurs when the property owner has not capitulated and refused to transfer the demanded property to the government. Under such circumstances the takings clause is not directly applicable because, by reason of the landowner's refusal, there has been no actual taking of property. The answer was forthcoming in *Koontz v. St. Johns River Water Management District*[64] wherein the Court held that extortionate governmental demands of developers are unconstitutional even when the developer does not accede to the demand. This is so because, even

[63]   *Id.* at 391.
[64]   ____ U.S. _____, 133 S. Ct. 2586 (2013).

though no taking has occurred, the demand burdens the right not

to have property taken without compensation.

> The Florida Supreme Court puzzled over how the government's demand for property can violate the Takings Clause even though "no property of any kind was ever taken," but the unconstitutional conditions doctrine provides a ready answer. Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation. As in other unconstitutional conditions cases in which someone refuses to cede a constitutional right in the face of coercive pressure, the impermissible denial of a governmental benefit is a constitutionally cognizable injury.[65]

Several relevant points can be synthesized from the *Nollan-Dolan-Koontz* trilogy:

- A restriction on land use does not constitute an unconstitutional taking if it substantially advance[s] legitimate state interests and does not deny an owner economically viable use of his land.

- The government may constitutionally demand the conveyance of property as a condition to obtaining a land

---

[65] *Id.* at 2596

use permit so long as (1) there is a nexus between the required conveyance and the public interest *and* (2) there is a rough proportionality between the cost to the owner or developer and the adverse impact of the proposed development.

- The unconstitutional exaction doctrine is not limited to conveyances of interests in real property. A governmental attempt to coerce a landowner into paying money may also qualify.

- Although the analytical framework may differ slightly, in the end result there is no difference between the owner who accedes to the extortionate demand and the owner who refuses.

### 3. *The county never imposed an exaction on Toll Bros.*

An element of an unconstitutional exactions claim is that there has been a demand made upon the landowner by the government as a condition to obtaining a permit. The un-rebutted record here shows there was never a demand on Toll Bros. by the

county, and therefore it has not attempted to impose an unconstitutional exaction on the developer.

### a. *A governmental demand is an element of an unconstitutional exaction.*

In order to make out a claim of an unconstitutional demand, there must first be a demand. Toll Bros.' argument fails because there never was one here. Although the necessity of proving a demand in these cases seems intuitively obvious, it has been articulated in some opinions, most notably Justice Kagan's dissent in *Koontz.* Ordinarily trial courts do not rely upon dissenting Supreme Court opinions when fashioning their own opinions. This court emphasizes that, as Justice Kagan noted, the majority in *Koontz* seemed to agree with her that a demand is a predicate to the application of the doctrine.

In her dissent in *Koontz* Justice Kagan, joined by three other justices, underscored that a demand is required in these cases. She wrote:

> *Nollan* and *Dolan* apply only when the government makes a "demand[ ]" that a landowner turn over property in exchange for a permit. I understand the majority to agree with that proposition: After all, the entire unconstitutional conditions doctrine, as the majority notes, rests on the fear that the government

may use its control over benefits (like permits) to "coerc[e]" a person into giving up a constitutional right. A *Nollan–Dolan* claim therefore depends on a showing of government coercion, not relevant in an ordinary challenge to a permit denial. Before applying *Nollan* and *Dolan,* a court must find that the permit denial occurred because the government made a demand of the landowner, which he rebuffed.[66]

As noted, the majority apparently agreed that a demand was a predicate to application of the unconstitutional exactions doctrine:

> [W]e decline to reach respondent's argument that its demands for property were too indefinite to give rise to liability under *Nollan* and *Dolan.* The Florida Supreme Court did not reach the question whether respondent issued a demand of sufficient concreteness to trigger the special protections of *Nollan* and *Dolan.* It relied instead on the Florida District Court of Appeals' characterization of respondent's behavior as a demand for *Nollan/Dolan* purposes. Whether that characterization is correct is beyond the scope of the questions the Court agreed to take up for review. If preserved, the issue remains open on remand for the Florida Supreme Court to address. This Court therefore has no occasion to consider how concrete and specific a demand must be to give rise to liability under *Nollan* and *Dolan.*[67]

This passage can only be read as acknowledging the necessity of a demand; otherwise there would be no need to remand for a determination whether it was of "sufficient concreteness to trigger the special protections of *Nollan* and *Dolan.*"

---

[66] *Id.* at 2610

[67] *Id. at 2598*

The proposition that there must be a "demand" is reinforced by the *Koontz* majority's repeated references to the extortionate nature of the government's demand:

- [L]and-use permit applicants are especially vulnerable to the type of coercion that the unconstitutional conditions doctrine prohibits because the government often has broad discretion to deny a permit that is worth far more than property it would like to take. By conditioning a building permit on the owner's deeding over a public right-of-way, for example, the government can pressure an owner into voluntarily giving up property for which the Fifth Amendment would otherwise require just compensation. So long as the building permit is more valuable than any just compensation the owner could hope to receive for the right-of-way, the owner is likely to accede to the government's demand, no matter how unreasonable. Extortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them.

- "Our precedents thus enable permitting authorities to insist that applicants bear the full costs of their proposals while still forbidding the government from engaging in 'out-and-out … extortion' that would thwart the Fifth Amendment right to just compensation.

- "Extortionate demands for property in the land-use permitting context run afoul of the Takings Clause not because they take property but because they impermissibly burden the right not to have property taken without just compensation."

- "That is not to say, however, that there is *no* relevant difference between a consummated taking and the denial of a permit based on an unconstitutionally extortionate demand."

47

- "Mindful of the special vulnerability of land use permit applicants to extortionate demands for money, we do so again today."

The references to the extortionate nature of the demand are not confined to *Koontz;* the other members of the trilogy--*Nollan* and *Dolan*—make similar references. In *Dolan* the Court observed the "absence of a nexus left the Coastal Commission in the position of simply trying to obtain an easement through gimmickry, which converted a valid regulation of land use into 'an out-and-out plan of extortion."[68] In *Nollan* the Court opined "[w]hatever may be the outer limits of 'legitimate state interests' in the takings and land-use context, this is not one of them. In short, unless the permit condition serves the same governmental purpose as the development ban, the building restriction is not a valid regulation of land use but an out-and-out plan of extortion."[69] The holdings in *Nollan* and *Dolan* were concisely summarized by Justice Scalia in a memorandum opinion dissenting from the denial of a writ of certiorari: "The object of the Court's holding in *Nollan* and *Dolan*

---

[68]    *Dolan v. City of Tigard*, 512 U.S.  374, 387 (1984)
[69]    *Nollan v. California Coastal Commission,* 483 U.S. 825, 837 (1987)

was to protect against the State's cloaking within the permit process an out-and-out plan of extortion."[70]

These repeated references to extortion are pertinent here because they demonstrate that a demand is essential to an unconstitutional exactions claim. By definition, extortion involves a demand of some sort. The underlying purpose of *Nollan-Dolan-Koontz*—"to protect against the State's cloaking within the permit process an out-an-out plan of extortion"—necessarily subsumes there has been a demand by the government.

### b. New Castle County never made a demand on Toll Bros.

There is no evidence in the instant case that New Castle County ever made a demand on Toll Bros. In its opinion the Board of Adjustment found there were no negotiations between the county and Toll Bros.:

> There is no evidence, however in the Board's record, from either party, about negotiations that took place between them, which would be critical information for [Toll Bros.] to provide to the Board in support of its constitutional argument under the *Koontz* line of

---

[70] *Lambert v. City and County of San Francisco*, 529 U.S. 1045 (2000)(mem.)(Scalia. J., dissenting from denial of certiorari)(internal quotation marks omitted).

49

> cases. In response to this assertion [of an unconstitutional exaction] by [Toll Bros.], the Department asserted that no negotiations took place because it had no authority, under the circumstances, to negotiate. [Toll Bros.] did not counter that assertion. [71]

Toll Bros. did not dispute the Board's finding in its brief before this court. Nor did it request an evidentiary hearing before this court evidence to present evidence of a demand despite the fact that the certiorari statute applicable here allowed Toll Bros. to do so. The standard or review here requires this court to accept all factual findings which are supported by substantial evidence, and the record amply supports the Board's findings. The court therefore concludes there was never a demand made upon Toll Bros. Consequently there has not been an unconstitutional exaction.

In the absence of a demand Toll Bros. cannot make out an unconstitutional exaction claim. There has been, at most, a denial of a land use permit which does not, by itself, amount to a constitutional violation. In *City of Monterey v. Del Monte Dunes at*

---

[71] The court has reviewed Toll Bros. written submittals to the Board and finds no contention there was a demand. The absence of any such contention, either before the Board or here, in understandable because the evidence strongly suggests there never was one.

*Monterey*[72] the United States Supreme Court expressly declined to apply *Nollan* and *Dolan* under such circumstances:

> [W]e have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public use. The rule applied in *Dolan* considers whether dedications demanded as conditions of development are proportional to the development's anticipated impacts. It was not designed to address, and is not readily applicable to, the much different questions arising where, as here, the landowner's challenge is based not on excessive exactions but on denial of development. We believe, accordingly, that the rough-proportionality test of *Dolan* is inapposite to a case such as this one.[73]

The lack of any evidence of a demand is dispositive of the issue, and the court need go no further. It notes, however, there is an independent reason why the unconstitutional exactions doctrine should not be applied here. Although there is some divergence of opinion,[74] many courts have held that general statutory restrictions,

---

[72]  526 U.S. 687 (1999)
[73]  *Id. at* 702-3 (citations omitted)
[74]   Last month, in an memorandum opinion concurring in the denial of a petition for a writ of certiorari, Justice Thomas wrote:

> For at least two decades, however, lower courts have divided over whether the *Nollan/Dolan* test applies in cases where the alleged taking arises from a legislatively imposed condition rather than an administrative one. That division shows no signs of abating. The decision below, for example, reiterated the California Supreme Court's position that a legislative land-use measure is not a taking and survives a constitutional challenge so long as the measure bears a reasonable relationship to the public welfare.

evenly applied, do not constitute an unconstitutional exaction under the trilogy. Rather the exaction must come in the form of a demand arising from an administrative requirement particular to the requested land use permit. A California court of appeals put it this way:

> The sine qua non for application of *Nollan/Dolan* scrutiny is thus the discretionary deployment of the police power in the imposition of land-use conditions in individual cases. Only individualized development fees warrant a type of review akin to the conditional conveyances at issue in *Nollan* and *Dolan*.[75]

In all three of the *Nollan-Dolan-Koontz* trilogy there was an individualized administrative judgment which resulted in a demand on a particular owner. In this case there is a statutory scheme applicable to all property owners in the county. It is a scheme which is directly linked to the need for supporting infrastructure generated by the proposed development. This case therefore bears little resemblance to the circumstances present in the trilogy.

---

*California Building Industry Ass'n v. City of San Jose,* ___U.S.___, ___S.Ct.____ No. 15–330 (February 29, 2016)(Thomas, J., concurring in denial of certiorari)(citations and internal quotation marks omitted).

[75] *Action Apartment Ass'n v. City of Santa Monica*, 82 Cal.Rptr.3d 722 (Cal. App. 2008)(citations and internal quotation marks omitted)

## Conclusion

The decision of the New Castle County Board of Adjustment is

**AFFIRMED**.


March 28, 2016

_____
John A. Parkins, Jr.
Judge

oc: Prothonotary

cc: John E. Tracey, Esquire, Young Conaway Stargatt &
Taylor, LLP, Wilmington, Delaware
Sidney S. Liebesman, Esquire; Lisa Zwally Brown,
Esquire, Montgomery, McCracken, Walker &
Rhoads, LLP, Wilmington, Delaware
Brian J. Merritt, Esquire, New Castle County
Department of Law, New Castle, Delaware